RENDERED: AUGUST 14, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0361-DG

CITY OF PAINTSVILLE; PAINTSVILLE          APPELLANTS
POLICE DEPARTMENT; SHANE
CANTRELL; AND ZACHARY
STAPLETON

<table>
<tr><td>V.</td><td>ON REVIEW FROM COURT OF APPEALS<br>NO. 2022-CA-0402<br>JOHNSON CIRCUIT COURT NO. 21-CR-00019</td></tr>
</table>

PAULA M. HANEY, AS PERSONAL          APPELLEES
REPRESENTATIVE OF THE ESTATE
OF DONALD PRATER, JR.; JOHNSON
COUNTY SHERIFF'S DEPARTMENT;
AND JEFF TABOR

AND

2024-SC-0074-DG

PAULA M. HANEY, AS PERSONAL      CROSS-APPELLANT/APPELLEE
REPRESENTATIVE OF THE ESTATE
OF DONALD PRATER, JR.

<table>
<tr><td>V.</td><td>ON REVIEW FROM COURT OF APPEALS<br>NO. 2022-CA-0402<br>JOHNSON CIRCUIT COURT NO. 21-CR-00019</td></tr>
</table>

CITY OF PAINTSVILLE; PAINTSVILLE      CROSS-APPELLEES/APPELLANTS
POLICE DEPARTMENT; SHANE
CANTRELL; AND ZACHARY
STAPLETON

AND

JOHNSON COUNTY SHERIFF'S                                    APPELLEES
DEPARTMENT; JEFF TABOR;
PAINTSVILLE FIRE DEPARTMENT;
AND RICK RATLIFF

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

Donald Prater, Jr. left a hospital nude from the waist down and proceeded to enter a hotel. Law enforcement officers responded. After they approached Prater, who was now on a public street and uncooperative, they attempted to arrest him. Prater resisted arrest and the officers responded using measured force against him. When this was not effective in subduing him, they gradually escalated the force. Prater stopped breathing shortly after he was finally handcuffed and taken into custody, and despite appropriate lifesaving measures being implemented, he died.

Paula M. Haney, as personal representative of the Estate of Donald Prater, Jr., filed a wrongful death suit against multiple defendants in two general categories: (1) the City defendants: the City of Paintsville (the City); the Paintsville Police Department (the Police Department); two Paintsville police officers: Zach Stapleton and Shane Cantrell (the police officers); the Paintsville Fire Department (the Fire Department); and its fire chief and head of its emergency medical services (EMS), Rick Ratliff; and (2) the County defendants: the Johnson County Sheriff's Department (the Sheriff's Department); and its

deputy, Jeff Tabor.[1] The circuit court dismissed by granting summary judgment to all of the defendants in four separate orders.

On direct appeal, the Court of Appeals affirmed in part, reversed in part, and remanded. The City defendants and Haney each sought and were granted direct review and oral argument. In case number 2023-SC-0361-DG, the City defendants appeal from the portions of the Court of Appeals' opinion which reversed the dismissals against the City defendants. In case number 2024-SC-0074-DG, Haney appeals from the portion of the Court of Appeals' opinion which affirmed the circuit court's orders. The County defendants did not appeal.

We affirm the Court of Appeals in part and reverse in part, as we conclude that the circuit court appropriately dismissed all of the defendants.

## I. FACTUAL[2] AND LEGAL BACKGROUND

On April 17, 2020, at approximately 6:32 p.m., the Paintsville Fire Department and EMS received a call about a man who was sitting on the front

---

[1] To avoid confusion, we continue to refer to these parties as "the defendants." We also categorize sub-groups of the defendants by their roles. We use the term "first responders" to collectively refer to Officers Stapleton and Cantrell, Deputy Tabor, and Chief Ratliff and the term "government entities" to collectively refer to the City, the Police Department, the Fire Department, and the Sheriff's Department/County. We use the terms "law enforcement officers" and "officers" interchangeably to collectively refer to Officers Stapleton and Cantrell, and Deputy Tabor.

[2] We follow the circuit court's and the Court of Appeals' practice of omitting details provided in witness statements/depositions in which there is no corroboration by another person so as to consider the facts in the most favorable light to Haney. In doing so, we recognize that an omission of corroborating details is not necessarily a contradiction. These omitted details are not needed for our decision affirming. Suffice it to say, these additional details elevate the officers' perception of the threat they were facing if they were unsuccessful in countering Prater's actions while they worked to subdue him and place him under arrest.

3

porch of a vacant home on Main Street in Thelma, Kentucky, which was listed for sale. EMS responded a few minutes later and found Prater on the porch; he was wearing a t-shirt but was otherwise naked and had mud and blood all over him. EMS transported Prater to Paul B. Hall Hospital at approximately 7:22 p.m. and Deputy Tabor of the Johnson County Sheriff's Department was dispatched to the hospital.

Deputy Tabor spoke to Prater at his bedside. Prater told Deputy Tabor that he had consumed bad methamphetamine and had been hallucinating that he had been hit by a train that pushed his soul out of his body. Deputy Tabor left after being advised that the doctors would perform an examination of and toxicology screening on Prater.

At approximately 7:54 p.m., hospital staff called 911 to notify the dispatcher that Prater had ripped a phone off the wall and while clothed only in a t-shirt, left the hospital through the back door. Officers Stapleton and Cantrell of the Paintsville Police Department were dispatched to the hospital. Deputy James Keeton with the Johnson County Sheriff's Department called Deputy Tabor on his personal cell phone to inform him that the Police Department was responding to a call about a male who had run partially naked from the hospital.[3]

---

[3] During oral argument, counsel for Haney stated a belief that Prater ran from the hospital in a hospital gown. There is no support for this supposition based upon any of the eyewitness accounts. Instead, at all relevant times Prater was apparently wearing only his t-shirt.

Officers Stapleton and Cantrell arrived at the hospital and hospital staff notified them that a security guard had followed Prater to the back of the Ramada Inn. Officers Stapleton and Cantrell went in that direction and Deputy Tabor went to the Ramada Inn parking lot to assist them.

The three officers met the hospital security guard at the Ramada Inn and were advised that Prater went inside the hotel. After they were informed by someone at the hotel that a naked man had been there but had since left, they split up to look for Prater. Shortly thereafter, the officers were informed by dispatch that someone from a nearby apartment complex reported that a naked man was walking along Main Street.

Officer Cantrell made contact with Prater at approximately 8:12 p.m. on Main Street. Prater was wearing only a t-shirt, was covered in mud, and had blood and scrapes on his legs. Officer Cantrell asked Prater his name. Prater yelled and cussed at Officer Cantrell.

Officer Stapleton arrived shortly thereafter. Prater began walking down Main Street. Officer Cantrell ordered Prater to stop and then Officer Stapleton also asked him to stop. Prater screamed and cussed at Officer Stapleton who unholstered his taser and "presented" it to Prater. Prater went around a car and rushed toward Officer Stapleton, who fired his taser. The probes struck Prater, but seemingly "unfazed," Prater ripped out the probes and ran up Main Street.

Officers Stapleton and Cantrell ran after Prater. Eventually Prater turned around and rushed toward Officer Cantrell, who in backing up tripped and fell.

5

Officer Stapleton used pepper spray on Prater, but it also had no discernable effect on him. Officer Stapleton continued to pursue Prater.

Next, Deputy Tabor arrived, and he heard Officer Stapleton order Prater to stop and get on the ground. Prater did not obey.

Officer Stapleton hit Prater with his baton on Prater's right thigh; the strike had no visible effect on Prater. Officer Stapleton struck him a second time in the same location.

Deputy Tabor was able to take Prater to the ground, resulting in Prater being face-down in a prone position. Prater was flailing and fighting. He placed his arms under his chest. Prater tried to get up and refused to move his arms so that he could be handcuffed. Deputy Tabor responded with open handed strikes to the left side of Prater's torso, but this too appeared to have no effect. Meanwhile, Officer Cantrell yelled at Prater to stop resisting and used his baton to try to pry Prater's right arm out from under him.

Deputy Tabor "dry stunned"[4] Prater with his taser on the back of each of Prater's thighs so he could get Prater's arms out from under his torso and handcuff him.[5] Prater continued to resist and curse while the three officers worked together to handcuff him.

---

[4] Drying stunning is when the taser is directly applied to the body, rather than applied at a distance through probes.

[5] This puts the total taser stuns that Prater experienced at three. The witness accounts are consistent on this figure. At oral argument, Haney's counsel expressed a belief that Prater was tased perhaps as many as six times. However, there is nothing in the record to support this supposition.

While all this was occurring, Chief Ratliff arrived at approximately 8:13 p.m. with his wife Kerri Ratliff who remained in the vehicle but observed what was occurring. Chief Ratliff held Prater's left arm. It took two people on each arm to get Prater cuffed by Officer Cantrell.

Prater was deemed to be in custody at approximately 8:14 p.m. and the officers left him on the ground as they took a moment to catch their breath. At approximately 8:16 p.m., Chief Ratliff, who was watching Prater, noticed that Prater's breathing become shallow and rolled him onto his back. Chief Ratliff grabbed his pocket mask, started rescue breathing, and began monitoring Prater's pulse. Once Chief Ratliff determined he could not find Prater's pulse, officers began compressions for CPR and contacted EMS. Officers Stapleton and Cantrell took turns performing CPR while Chief Ratliff administered Narcan[6] to Prater.

CPR continued by those on the scene until the EMS crew arrived less than two minutes after they were requested and took control. EMS immediately took Prater back to the hospital. Prater was pronounced dead at 8:54 p.m.

The Kentucky State Medical Examiner, Dr. Meredith Frame, conducted a postmortem examination of Prater's body on April 18, 2020, and issued two reports: the Post Mortem Examination and the Final Diagnosis.[7] In the Post

---

[6] Narcan is the brand name of Naloxone. It is used to reverse the effects of life-threatening reactions to the ingestion of opioids.

[7] Deputy Coroner Harry Frisby of the Johnson County Coroner's Office produced these records at his deposition, along with his Coroner's Investigation Report which listed the cause of death as "Excited Delirium Syndrome per M.E./autopsy" and the Kentucky Certificate of Death which also listed "Excited Delirium Syndrome."

7

Mortem Examination, in the evidence of injury section, Dr. Frame noted abrasions to Prater's head, abrasions and contusions to his torso, upper extremities and lower extremities, including "a pattern of linear contusion of approximately 6 ½ inches in length with a periodicity of ¼ inch of the anterior aspect of the right thigh."[8] He noted "[u]pon internal examination, focal soft tissue hemorrhage is associated with anterior rib fractures of right ribs 2-5 and left ribs 4 and 6. These may be consistent with history of resuscitation attempts." Dr. Frame also noted the absence of any hemorrhage to Prater's head and neck, the lack of any damage to the neck structures, and the absence of any fracture to his skull.

In the Final Diagnosis, Dr. Frame stated "[n]o lethal trauma identified" but that Prater had abrasions, contusions, and evidence of medical intervention and resuscitation attempts. Dr. Frame noted evidence of hypertensive cardiovascular disease, extensive pleural adhesions, and that Prater only tested positive for THC. Dr. Frame opined:

> Based on the history provided and the postmortem findings, the death of this 48-year-old man, Donald Prater, is attributed to excited delirium syndrome. A psychiatric history for the decedent is unknown at the time of this report, but excited delirium syndrome can be associated with an acute psychotic episode that may present with similar symptoms and findings as in this case. The decedent also reportedly said that he had been up for several days after using methamphetamine. Methamphetamine is not detected in the blood or urine samples available at autopsy. However, the presence of a drug not available for testing in the extensive toxicology performed cannot be excluded. The history of a physical altercation with police using a baton and conducted electrical device is noted. No lethal trauma is identified. The

---

[8] These contusions appear to be consistent with the reported baton strikes.

possibility of the physical altercation contributing to physiologic stress resulting in cardiac arrest cannot be determined. Review of the hospital lab findings during his first admission (prior to the police encounter) suggests significant physiological derangements, including renal failure, hyperammonemia and acute rhabdomyolysis, that can result in sudden death. Hypertensive cardiovascular disease is considered contributory.

## A. Circuit Court Case

On January 27, 2021, Haney filed suit against the City and County defendants. Haney alleged that Officers Stapleton and Cantrell, Deputy Tabor, and Chief Ratliff in their individual capacities committed battery, wrongful death, used excessive force, and were negligent and grossly negligent in effecting the arrest of Prater in performing their ministerial duties or were acting in bad faith in performing their discretionary duties. Although Haney stated that the Police Department and the City were responsible for the adoption and implementation of policies and procedures and supervision of their employees, Haney did not bring any claims directly against any entities for negligent hiring, training, retention, or supervision.

### 1. The Dismissal of the Fire Department Defendants

On May 5, 2021, the Fire Department and Chief Ratliff (the Fire Department defendants) filed a Motion to Dismiss, alternatively arguing they were entitled to summary judgment. On May 17, 2022, the circuit court granted this motion and dismissed the Fire Department defendants with prejudice. The circuit court ruled that the Fire Department was entitled to governmental immunity and Chief Ratliff, as an agent of the Fire Department,

9

was clearly engaged in a discretionary function and was entitled to qualified official immunity.

### 2. The Dismissal of the City

On June 14, 2021, the City filed a motion to dismiss the claims against it or alternatively for summary judgment. On July 12, 2021, the circuit court granted the City's motion and dismissed the City with prejudice. The circuit court ruled that the City was immune based on the Claims Against Local Government Act (CALGA). Kentucky Revised Statutes (KRS) 65.200-65.2006.

### 3. The Police Defendants' Premature Motion for Summary Judgment

On October 5, 2021, the Police Department and Officers Stapleton and Cantrell (the Police defendants) brought a motion for summary judgment. On October 15, 2021, the circuit court concluded that Haney should be allowed a reasonable period of time to engage in discovery and denied the motion without prejudice to the ability of the defendants to refile it once discovery had taken place.

### 4. The Amended Complaint

On January 6, 2022, Haney filed a motion for leave to file an amended complaint to include a new claim of negligent hiring, training, retention, and supervision against the Police Department, the City, the Sheriff's Department, and the Fire Department. Haney alleged Officer Cantrell was negligently hired and retained by the Police Department and the City because he had numerous employee warning reports; Officers Stapleton and Cantrell were negligently supervised as the entities should have known they were not qualified to deal

10

with a mentally incapacitated Prater and allowed them to use excessive force; and they were negligently trained to deal with a person with an altered mental state. Haney alleged the Fire Department negligently supervised Chief Ratliff by allowing him to act outside of the scope of his duties and participate in an arrest. Haney also alleged the Sheriff's Department negligently supervised Deputy Tabor by allowing him to use excessive force when apprehending Prater.

On January 14, 2022, after a hearing, the circuit court granted the motion for leave to amend the complaint but stated that the defendants were not required to file an answer. Two motions for summary judgment soon followed, one from the Police defendants and one from the County defendants.

**5. Request for Continuance**

On January 27, 2022, Haney asked for a thirty-day continuance regarding the deadline to file the witness and exhibit list, noting it was to be completed sixty days prior to trial and discovery was to be completed thirty days prior to trial, with the trial scheduled for April 11, 2022. In support of this request, Haney explained that several depositions had to be renoticed and responses to discovery requests were due eight days before the current deadline.

On February 10, 2022, Haney filed an amended motion for a continuance of the discovery deadline and trial date.

At the same February 18, 2022, hearing addressing the two motions for summary judgment discussed *infra*, the circuit court also considered Haney's

11

motion for a continuance. On February 21, 2022, the circuit court granted both motions for summary judgment. These orders had the effect of denying Haney's motion for a continuance as all defendants were dismissed.

### 6. The Dismissal of the Police Defendants

On February 4, 2022, the Police defendants filed their renewed motion for summary judgment. They argued it was now appropriate for them to be granted summary judgment because depositions had been taken of Haney and all the fact witnesses: Officer Stapleton, Officer Cantrell, Deputy Tabor, Chief Ratliff, Kerri Ratliff, and Deputy Coroner Frisby.

On February 21, 2022, the circuit court granted the renewed motion for summary judgment filed by the Police defendants and dismissed all claims against the Police Department and Officers Stapleton and Cantrell. The circuit court concluded that the police officers were entitled to qualified official immunity because they acted in good faith, used reasonable force, and did not use excessive force.

The circuit court further concluded that the use of force was reasonable based upon Prater committing the possible crimes of indecent exposure, third degree assault, menacing, resisting arrest, and disarming a police officer. The circuit court noted Prater had damaged hospital property, threatened the staff, and was walking around in public and entering businesses while half naked. The circuit court explained that the police officers did not use force against Prater until he attempted to attack them, and their response to his aggression was appropriate given his attempt to assault them and the danger to the

12

officers, the public, and Prater, based on his erratic behavior and attempts to elude arrest. The circuit court noted the amount of force the police officers could use was discretionary, there was no indication that they acted in bad faith in their on-the-spot judgment, and "there is no evidentiary fact of record that would suggest that at any point in their encounter with Mr. Prater that the officers acted with excessive force." Instead, the circuit court concluded the police officers acted with reasonable force and Haney could not establish they were negligent, committed battery, or engaged in excessive force. Further, Haney provided no proof that the police officers caused Prater's death.

The circuit court determined that the claim against the Police Department for negligent hiring, retention, training, or supervision was dependent on the police officers actually committing a tort or negligence against Prater. The circuit court concluded that because Haney failed to establish any tort or negligence by the police officers, the claims against the Police Department failed as a matter of law.

**7. The Dismissal of the County Defendants**

On February 7, 2022, the County defendants filed a motion for summary judgment. On February 21, 2022, the circuit court dismissed the County defendants with prejudice. The circuit court explained that the Sheriff's Department was not a legal entity that could be sued and if such claims were construed as against the County, it had sovereign immunity. The circuit court determined Deputy Tabor was entitled to qualified official immunity because he was acting within the scope of his discretionary authority, and Haney was not

13

able to show that Deputy Tabor did not act in good faith. The circuit court concluded Haney had no evidence to establish: Deputy Tabor breached his duty of care toward Prater, Deputy Tabor was negligent, or his actions were the proximate cause of Prater's death. The circuit court explained it would not presume negligence from the fact that Prater died where there was no evidence to support that there was negligence, Deputy Tabor was privileged to use reasonable force to effect Prater's arrest, mental illness did not exempt Prater from having force used against him, and Prater could be tased while on the ground where he continued to resist.

### 8. Motion to Alter, Amend, or Vacate

On March 3, 2022, Haney filed a timely motion to alter, amend, or vacate the orders granting summary judgment to the remaining defendants, arguing among other things that she still needed to depose additional persons and believed Deputy Keeton[9] would verify that excessive force was used and the circuit court overstated the medical opinions in opining there was no lethal trauma or asphyxiation.

On March 18, 2022, the circuit court denied Haney's motion.

---

[9] Officer Stapleton's report mentions Deputy Keeton's vehicle being pulled in after Officer Cantrell's vehicle at the scene where they located Prater but does not report Deputy Keeton participating in any way in their attempts to arrest Prater. In his deposition, Officer Stapleton confirms seeing Deputy Keeton's vehicle and seeing Deputy Keeton standing beside it but explains he did not see Deputy Keeton after that time.

14

**B. Direct Appeal**

Haney filed an appeal as a matter of right with the Court of Appeals regarding the circuit court's orders granting: (1) the renewed motion for summary judgment to the Police Department and Officers Stapleton and Cantrell; (2) summary judgment to the Sheriff's Department and Deputy Tabor; (3) the motion to dismiss to the City; and (4) the motion to dismiss to the Fire Department and Chief Ratliff. Haney argued the circuit court erred in granting the renewed motion for summary judgment by: (1) engaging in fact finding regarding Prater's cause of death where there were conflicting medical opinions and the trial court ignored Dr. Michael Freeman's opinion; (2) ignoring her argument in her motion to alter, amend, or vacate that the circuit court's findings of fact were incorrect in that Officer Stapleton escalated the level of force in bad faith by unholstering his taser while Prater was walking away from him; (3) disregarding evidence that Deputy Tabor did not follow the Sheriff's Department's policy which cautions that multiple uses of an electronic control device against an individual suffering from others symptoms such as cocaine intoxication may increase the risk of serious injury by dry stunning Prater and the Sheriff's Department did not follow its policy and ministerial duty for a complete investigation; (4) granting dismissal and summary judgment to the defendants before discovery was completed; and (5) failing to consider new evidence regarding Chief Ratliff's material participation in the arrest which was outside of his role and thus not subject to any type of immunity.

The Court of Appeals opinion affirmed in part, reversed in part, and remanded. *Haney v. City of Paintsville*, No. 2022-CA-0402-MR, 2023 WL 3555507 (Ky. App. May 19, 2023) (unpublished). The Court of Appeals concluded that the Fire Department was entitled to government immunity and Chief Ratliff was clearly entitled to qualified immunity as he was acting in his role overseeing emergency medical services and providing those services at the scene. *Id.* at *4. The Court of Appeals determined that Chief Ratliff exercised his discretion in that role in making a judgment that his assistance was needed to place Prater in handcuffs. *Id.*

However, as to the City, the Court of Appeals disagreed with the circuit court's dismissal of the City on immunity grounds and reversed. The Court of Appeals reasoned "KRS 65.2003 clearly limits the immunity granted by the statute to those occasions when the municipality is engaged in judicial, quasi-judicial, legislative, or quasi-legislative functions" but does not preclude Haney's theory of liability against the City for negligent hiring, oversight, and retention because that "is as non-governmental a task as there can be" as such "a theory of liability [is] regularly forwarded against private entities" and "in hiring and overseeing an employee . . . a municipality acts most as a private entity and least as a governmental one." *Id.*

The Court of Appeals reversed the circuit court's grant of summary judgment to the Police Department as a subdivision of the City, as it was sued under the theory of negligent hiring, training, and retention, and like the City was not protected by immunity pursuant to KRS 65.2003. *Id.* at *5.

16

The Court of Appeals affirmed the grant of summary judgment to the Sheriff's Department as it was entitled to sovereign immunity as a subdivision of the county government. *Id.*

As to Deputy Tabor and Officers Stapleton and Cantrell, the Court of Appeals concluded that the circuit court's finding that all three officers were entitled to qualified immunity was premature, as there was no finding regarding whether they owed Prater a duty of care above that owed to the general public because there was a "special relationship" which existed between the officers and Prater by virtue of them arresting him. *Id.*

Deputy Tabor and the City defendants filed petitions for rehearing which the Court of Appeals denied. The City defendants then filed a motion for discretionary review and Haney did as well.

## C. Discretionary Review

We granted discretionary review for two separate but consolidated appeals and held oral argument. In 2023-SC-0361-DG, the City defendants ask our Court to reverse the portion of the Court of Appeals' opinion which: (1) reversed summary judgment as to Officers Stapleton and Cantrell on the basis that the circuit court failed to make a finding as to whether there was a special relationship between the parties; (2) reversed the dismissal of the Police Department and the City for negligent hiring, training, retention, and supervision on the basis that the Court of Appeals was incorrect that the circuit court relied on CALGA as providing immunity when in fact the circuit court concluded that these claims were not viable against the Police

17

Department because there was no underlying tort or negligence committed by Officers Stapleton and Cantrell which could support such claims and the same rationale should apply to the City; and (3) reversed the dismissal of the claims made against Officer Cantrell where Haney failed to raise any discussion regarding the dismissal of Officer Cantrell in her brief before the Court of Appeals.

In 2024-SC-0074-DG, Haney cross-appeals and asks our Court to affirm the portion of the Court of Appeals opinion which reverses portions of the circuit court judgment, reverse the remainder of that opinion, and remand the action to the circuit court for the completion of discovery and a trial on the merits. Haney specifically argues that the Court of Appeals should not have affirmed the portion of the circuit court's opinion which granted summary judgment because it applied the wrong summary judgment standard, a genuine issue of material fact exists regarding Prater's cause of death, and it was premature to enter summary judgment on Prater's cause of death prior to the completion of discovery. Haney argues she properly alleged the existence of a special relationship between the officers and Prater, the circuit court erred in failing to find such a special relationship, any error the Court of Appeals may have made in improperly characterizing the dismissal of certain claims against the City was harmless error, and it was correct to reverse the dismissal of the claims made against Officer Cantrell.

The County defendants are appellees in both of these appeals.

18

## II. ANALYSIS

Collectively the defendants brought four successful motions that dismissed claims against them. Two motions were filed seeking dismissal pursuant to the Kentucky Rules of Civil Procedure (CR) 12.02(f) but alternatively requested summary judgment pursuant to CR 56.02. The latter two motions only sought summary judgment. In each case the defendants incorporated matters outside the pleadings to their motions and Haney did likewise in her responsive pleadings.

CR 12.02 provides:

> If . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Accordingly, we review all the grants of dismissal and summary judgment under the summary judgment standard specified in CR 56.03:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky. App. 1996). "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v.*

19

*Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). Summary judgment can only be properly granted "where the movant shows that the adverse party could not prevail under any circumstances." *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985).

We disagree with Haney that the trial court erroneously applied the federal summary judgment standard (which was discussed and rejected as the Kentucky standard in *Steelvest, Inc.*, 807 S.W.2d at 483) in resolving the defendants' motions. Summary judgment is appropriately granted where the opposing party only offers mere speculation to show that her version of events, which results in liability, is more likely than an alternative explanation which results in no liability: a mere possibility of wrongdoing is not enough to render the grant of summary judgment improper. *See Carucci v. N. Ky. Water Dist.*, 657 S.W.3d 924, 931 (Ky. App. 2022).

The key to resolving whether the governmental entities were properly dismissed involves determining if the individuals employed by the Police Department, the Sheriff's Department, and the Fire Department are immune from suit under the doctrine of qualified official immunity. If they are, their respective employers cannot be liable for their actions or for any failures for not appropriately hiring, retaining, supervising, or training them, as we explain *infra.*

## A. Sufficient Time for Discovery

Haney argues she did not have sufficient time to complete discovery before the trial court granted the defendants' motions and dismissed them from

20

the case when in granting the final motions for summary judgment the discovery deadline had not yet elapsed. She states she had scheduled depositions to be held prior to the discovery deadline for Police Chief Mike Roe, Captain Jonathan Holbrook, Dr. Willard Arnold, and Dr. Meredith, and claims they are material witnesses. Haney further argues that Deputy Keeton is believed to have observed what occurred on scene and will verify excessive use of force. Haney also states she was unable to notice his deposition prior to entry of the order. She argues her motion for a thirty-day continuance of discovery was properly filed prior to the motions for summary judgment and should have been granted.

The defendants counter Haney did not engage in any discovery for months after filing her complaint, Haney repeatedly cancelled scheduled depositions, and all fact witnesses had been deposed prior to the Police Department filing its renewed motion for summary judgment and the Sheriff's Department filing its motion for summary judgment. The defendants argue that dismissal was appropriate as they were entitled to a cessation of the burdens of litigation as soon as possible where immunity shields them from liability. They note that after summary judgment was granted, Haney cancelled all further pending depositions, thus declining to investigate whether there was any support whatsoever for her allegations about how any undeposed witnesses would testify.

Summary judgment can only be properly granted after the party opposing it "has been given ample opportunity to complete discovery, and then

21

fails to offer controverting evidence." *Pendleton Bros. Vending, Inc. v. Commonwealth Fin. & Admin. Cabinet*, 758 S.W.2d 24, 29 (Ky. 1988); *see also Suter v. Mazyck*, 226 S.W.3d 837, 841 (Ky. App. 2007). "It is not necessary to show that the respondent has actually completed discovery, but only that respondent has had an opportunity to do so." *Hartford Ins. Grp. v. Citizens Fid. Bank & Tr. Co.*, 579 S.W.2d 628, 630 (Ky. App. 1979). Absent a sufficient opportunity to develop the facts, however, summary judgment cannot be used as a tool to terminate the litigation. *Suter*, 226 S.W.3d at 842 (internal citation omitted).

Regarding immunity, the United States Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curium). This is in accordance with our own precedent. *See Breathitt Cty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 886 (Ky. 2009) (providing that an order denying sovereign immunity qualifies for an interlocutory appeal).

Having reviewed the record, the evidence establishes that Haney did not begin to engage in discovery until after the first motion to dismiss was filed. While there were delays at times in the defendants responding to discovery, Haney failed to use the mechanisms available to her to address these delays. She could have, but did not, file public records requests or file motions to compel. Haney also delayed previously scheduled depositions by rescheduling them. Even so, the fact witnesses, with the exception of Deputy Keeton, were deposed prior to the trial court granting the motions for summary judgment.

22

Chief Roe and Captain Holbrook were not present at the scene and only received reports from Officers Stapleton and Cantrell at the hospital about what had occurred. Therefore, they are not fact witnesses to what occurred at the scene and any information they had was derived from others' hearsay statements.

A year to complete discovery was more than ample time and it is not dispositive that the discovery deadline had not yet elapsed at the time the motions for summary judgment were granted.

We agree with the defendants that any further discovery on Haney's part would be futile as she cannot establish that there are any factual disputes which could result in a verdict in her favor. Waiting another month for the discovery deadline to pass would not have made any difference. Haney relies on supposition regarding how Deputy Keeton could testify and anticipates that if he had been deposed, he would have provided the "smoking gun" that would establish bad faith and improper use of force. Such supposition is not at all supported by any record evidence. While there is a basis to believe he was present at the scene of the arrest in his law enforcement vehicle, it is unclear whether Deputy Keeton observed any substantive part of the confrontation between the officers and Prater from his location. Therefore, it is unclear whether he could offer any useful eyewitness testimony, and if he could, it is unknown whether his testimony would be consistent or contrary to that of the officers more directly involved. A factual dispute cannot be manufactured on such a paucity of evidence.

23

Haney also had the opportunity to locate other eyewitnesses as the confrontation between Prater and the officers took place on a public street, but either has not done so or was not able to find any potential witness whose testimony would be helpful for her position.

Testimony from the medical examiner and the doctor who treated Prater would not have raised a factual issue either. Haney has failed to identify anything in the medical examiner's reports or Prater's medical records indicating there was any possible issue of fact as to Prater's cause of death which would make the first responders liable for his death. Accordingly, summary judgment was not granted prematurely.

**B. Dismissal of Suits against the First Responders was Appropriate based on Qualified Official Immunity.**

"[O]nce the material facts are resolved, whether a particular defendant is protected by official immunity is a question of law which we review *de novo.*" *Rowan Cty. v. Sloas,* 201 S.W.3d 469, 475 (Ky. 2006) (internal citation omitted). When a party is dismissed on the basis of immunity, we have only a legal question to resolve under the *de novo* standard, whether in fact such immunity exists; if it did, dismissal was warranted. *Jacobi v. Holbert*, 553 S.W.3d 246, 252 (Ky. 2018).

Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority.

*Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky. 2001) (internal citation omitted).

24

> [Qualified official immunity] is intended to protect governmental officers or employees from liability for good faith judgment calls in a legally uncertain environment. An act is not "discretionary" merely because some judgment is used in deciding on the means or method used. However, even if an act is discretionary, there is no immunity if it violates constitutional, statutory, or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith.

*Autry v. W. Kentucky Univ.*, 219 S.W.3d 713, 717 (Ky. 2007).

Accordingly, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Sloas*, 201 S.W.3d at 475 (quoting *Anderson v. Creighton,* 483 U.S. 635, 638 (1987)).

"Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523. If an employee's acts are discretionary and there is no allegation or suggestion that the employee's decision was made in bad faith, that employee is entitled to qualified official immunity. *Caneyville Volunteer Fire Dep't. v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 810 (Ky. 2009).

### 1. The Law Enforcement Officers Were Engaged in a Discretionary Act within the Scope of Their Authority.

As to the law enforcement officers (Officer Stapleton, Officer Cantrell, and Deputy Tabor), Haney argues that they were engaged in a ministerial act when they arrested Prater. We disagree that the officers were engaged in any kind of ministerial act in their efforts to arrest Prater. As explained in *Smith v. Norton*

25

*Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. App. 2016), "the determination of the amount of force required to effect . . . [an] arrest is . . . a discretionary act within the scope of a peace officer's authority." Therefore, they have already satisfied the first prong of qualified official immunity, that they were performing discretionary acts or functions in arresting Prater. It is similarly easy to determine that the officers act within the scope of their authority in arresting individuals as long as that arrest is warranted.

### 2. The Law Enforcement Officers Were Acting in Good Faith in Using the Force Necessary to Arrest Prater.

Haney does not seriously contest that Prater running about nude from the waist down in public was against the law. Haney argues that if the officers were engaged in a discretionary act in arresting Prater, they acted in bad faith in choosing to arrest him given that he had only committed a misdemeanor and was obviously suffering from a mental health crisis. She also argues that the measures they took to arrest him were inappropriate and constituted excessive and unjustifiable force which resulted in his death.

Haney argues that there was an issue of fact created by the opinion she provided from Dr. Freeman that the cause of Prater's death was attributable to the type, severity, and duration of restraint used on Prater by the defendants,

which most probably resulted in fatal injuries related to restraint-related asphyxia.[10] Haney argues that Prater was beaten to death.[11]

To determine whether the officers acted in good faith (or whether Haney has established that they acted in bad faith), we examine whether arresting Prater was permissible under the United States Constitution and state law, and if so, whether the force used to arrest him was permissible.

### a. It was Permissible to Arrest Prater for Committing a Crime.

"A warrantless arrest is [constitutionally] reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 56 (2018); *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964). Even a very minor criminal offense committed in an officer's presence allows for an arrest without violating the Fourth Amendment. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Under Kentucky law, officers are expected to use reasonable judgment in deciding whether to arrest a suspect. *Myers v. City of Louisville*, 590 S.W.2d 348, 350 (Ky. App. 1979). Pursuant to KRS 431.015(1)(b)3., "[a] peace officer may make an arrest instead of issuing a citation for a misdemeanor committed in his or her presence if the misdemeanor is: . . . An offense in which the defendant refuses to follow the peace officer's reasonable instructions."

---

[10] There is no evidence of record to indicate that Prater's cause of death was restraint-related asphyxia and Dr. Freeman's opinion was formed not by any of the evidence, but only from his examination of the pleadings.

[11] There is no evidence of record to indicate that Prater was beaten to death. The medical examiner noted only superficial trauma to Prater's body.

27

Therefore, the officers were properly exercising their discretion and conforming their actions to what the law requires in determining to arrest Prater for committing a misdemeanor, whether it be characterized as indecent exposure, disorderly conduct, or another crime, when he refused their commands to stop.

### b. The Level of Force Used was Reasonable because Prater was Actively Resisting Arrest and Lesser Types of Force Did Not Subdue Him.

The next question is whether the law enforcement officers used reasonable force in effecting Prater's arrest. To resolve this issue, we consider what level of force is constitutionally permissible, statutorily permissible, and otherwise in conformity with controlling policies.

### i. Constitutional Requirements

In *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989), the United States Supreme Court held that the constitutional standard governing a claim that officers used excessive force in the course of making an arrest is properly analyzed under the Fourth Amendment's "objective reasonableness" standard. The Court further clarified:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (internal quotation marks, citations, and parentheticals omitted).

In other words, in determining whether the force used is objectively reasonable, the "totality of the circumstances" must be considered "[t]o assess whether an officer acted reasonably in using force[.]" *Barnes v. Felix*, 605 U.S. ___, 145 S. Ct. 1353, 1356 (2025) (internal citation omitted). This inquiry includes a consideration of "all the relevant circumstances, including facts and events leading up to the [claimed use of excessive force]." *Id.*

When a suspect is actively resisting arrest by being noncompliant, force may appropriately be employed to force the suspect to surrender. "[T]he police may use significant force to subdue someone who is actively resisting lawful detention." *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). The use of escalating force is a constitutionally permissible response to continued resistance. *Id.* at 570; *see also Orr v. Copeland*, 844 F.3d 484, 493 (5th Cir. 2016); *Mobley v. Palm Beach Cty. Sheriff Dept.*, 783 F.3d 1347, 1355 (11th Cir. 2015); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993).

29

For example, in *Estate of Collins v. Wilburn*, 755 Fed. Appx. 550, 555 (6th Cir. 2018), the Sixth Circuit explained that it had previously found that active resistance to arrest included a suspect "physically struggling with, threatening, or disobeying officers as well as refusing to allow oneself to be handcuffed when coupled with disobedience of officer orders or threatening behavior." (Internal quotation marks and citation omitted). The Court concluded that where the evidence established that the suspect was actively resisting arrest and refusing to be handcuffed, it was appropriate for the officers to use force (which consisted of a knee strike and taser deployment) to make the suspect submit. *Id.* The Court further rejected the Estate's argument that a lesser degree of force is reasonable to make a misdemeanor arrest as ignoring two *Graham* factors, the suspect's violence in the course of the arrest and his active resistance to the attempts to subdue him. *Id.*

In considering whether an officer has violated the Fourth Amendment by using excessive force, the relevant consideration is "not the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'" *Miller v. Sanilac Cty.*, 606 F.3d 240, 252 (6th Cir. 2010) (quoting *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009)). Therefore, once an individual is in custody and is not actively resisting, it is excessive force to use pepper spray, deploy a taser, or hit the suspect. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902–03 (6th Cir. 2004); *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 731-32 (5th Cir. 2018).

A failure to follow "best police practices" does not establish that a constitutional violation has occurred. *Turner*, 979 F.3d at 568. While use of another approach, when considered with the benefit of hindsight, may have resulted in a better outcome, that is not the relevant standard. *Id.*

> [E]xpert testimony, which essentially opines on the best approach that the deputies could have taken in ideal circumstances, . . . does not establish that the [officers] violated [the suspect's] clearly established rights. As an initial matter, "[t]he Fourth Amendment . . . does not require police officers to take the better approach[,] . . . only that they take a reasonable approach."

*Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Comm'rs*, 870 F.3d 471, 486 (6th Cir. 2017) (quoting *Cook v. Bastin*, 590 Fed.Appx. 523, 528 (6th Cir. 2014)). Qualified immunity can still be satisfied if in considering the specific situation confronting the officers, they had sufficient reason to believe that their conduct was justified under the constitution and state law. *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 617 (2015).

The fact that a suspect ultimately dies after resisting arrest which officers respond to with escalating force does not mean that the suspect's rights were violated. *See Turner*, 979 F.3d at 569–70; *Mann v. Taser Int'l., Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009); *Wagner v. Bay City, Tex.*, 227 F.3d 316, 323–24 (5th Cir. 2000); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593–94 (7th Cir. 1997).

Sometimes when force is combined with a suspect's underlying health problems the suspect may die, but such result does not mean that the officers' use of force was unreasonable. *Turner*, 979 F.3d at 570. Additionally, leaving a

31

suspect face down in handcuffs while being monitored is not life-threatening force. *See Estate of Phillips*, 123 F.3d at 598.

### ii. Statutory Requirements

Similarly, "[u]nder Kentucky statutory law, a peace officer is not allowed to use unnecessary force or violence in making an arrest. KRS 431.025(3). But, he is entitled to use such force as is necessary, or reasonably appears so, to take a suspect into custody." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) (citing *City of Lexington v. Gray,* 499 S.W.2d 72, 74 (Ky. 1973)). Thus, an officer should "only [use] such force as is dictated by the circumstances." *Myers*, 590 S.W.2d at 350. Pursuant to KRS 503.090:

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant, acting under official authority, is making or assisting in making an arrest, and he:
>
>> (a) Believes that such force is necessary to effect the arrest;
>>
>> (b) Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and
>>
>> (c) Believes the arrest to be lawful.

"[A]ll persons have a legal duty to surrender to lawful arrest." *Haugh*, 242 S.W.3d at 686.

"Mental illness does not exempt a person from the use of reasonable force by the police." *Id.* at 687. In fact, a suspect's mental illness could provide an additional justification to try to take a suspect into custody quickly because a delay could increase the chance of the suspect harming himself, an officer, or

an innocent bystander. *Id.* Known mental illness is a factor to consider regarding the amount of force exerted, but it can still be reasonable to use a taser or pepper spray on a mentally ill person depending upon the specific situation. *See Palma v. Johns,* 27 F.4th 419, 438 (6th Cir. 2022).

### iii. Police Policies

The Police Department adopted the version of the Kentucky League of Cities' (KLC) Response to Resistance Policy implemented on May 22, 2008 (Police Policy). Pursuant to this policy, "[o]fficers have several force options that will be dictated by the actions of the suspect upon the appearance of the police officer. Officers may be limited in their options due to the circumstances and actions of the subject." These options are listed as: command presence, verbal commands, soft empty hand control, chemical spray, electronic control devices (tasers or stun guns), hard hand control (punches and other physical strikes), impact weapons (batons), canine, and deadly force.

The Police Policy relies on and incorporates KRS 503.090(1), discussed *supra*, without citing to it, regarding when the use of physical force is legally justifiable.[12] A policy that repeats statutory standards is of course appropriate.

The Police Policy further states:

Once the subject's active resistance has ceased and control has been gained an officer is no longer authorized to use force. Officers should immediately provide any necessary medical assistance to the subject to the degree in which they are trained and provide for emergency medical response where needed.

---

[12] The Police Policy only differs from KRS 503.090(1) in that it replaces the wording of "a defendant" in the first line with "an officer."

The Police Policy provides that police should use less-lethal weapons/tactics, including chemical spray and electronic control devices (tasers), to address "active resistance/active aggression[.]" It states that "Impact Weapons" (here the baton) can be used other places than the person's head and states they

> may be utilized in cases where the officers believe the use of these weapons would be reasonable to bring the event under control. Examples would be where other options have been utilized and failed or where based on the officer's perception at the time, the other options would not be successful in bringing the event to a successful conclusion.

There is no evidence in record that the Sheriff's Department had any specific policies on the use of force.[13] Thus, whether Deputy Tabor's actions were appropriate, is governed by the constitutional and statutory requirements on use of force.

### c. The Law Enforcement Officers Used Appropriate Force Against Prater.

There is no genuine dispute of material fact that Prater was actively resisting arrest. The undisputed evidence, which Haney has failed to counter in any significant way, is that Prater repeatedly failed to yield to law enforcement who tried to detain him when they observed him committing misdemeanors in their presence and they used gradually escalating appropriate force to attempt to subdue him and protect themselves and the other officers from harm. Thus,

---

[13] Although Haney references having been provided with the Sheriff's Department policies, the only policies in the record appear to be its Hiring Practice and its Training Directive, both of which are KLC's policies dated May 22, 2008. These policies do not establish standards for use of force.

34

they were using the amount of force that was dictated by the circumstances. *Myers*, 590 S.W.2d at 350.

When Prater was first encountered on a porch, he was taken to the hospital for an assessment. After he fled the hospital, still nude from the waist down, after engaging in vandalism, the law enforcement officers located him and asked him to stop. Prater would not obey and acted in an aggressive manner toward the officers. Each time they used force against him, it was insufficient to make him submit. Yet they kept using measured force against him in a reasonable manner that, while designed to cause discomfort so that he would surrender and allow himself to be arrested, was not likely to cause any serious or lasting harm.

Each of the measures the officers used (tasing, pepper spray, baton blow, tackling, or prying his arms free) were permissible to administer under the circumstances and did not violate the Constitution, our statute, or the Police Policies on use of force. The officers reacted appropriately within their discretion by countering Prater's continued resistance with the force they deemed necessary to arrest him and when that force did not force him to stop, they tried other appropriate non-life-threatening acts of force in conformity with all relevant law and policies.

Haney relies on the affidavit of a policing expert, Daniel J. Buskin, to establish that the officers acted improperly in reacting to Prater. He opined that "the tactics used by Officers on April 17, 2020, during their encounter with Prater were inconsistent with established law enforcement best practices and

35

KLC Policy creating a situation that led to the use of unnecessary force." Buskin admits he relied on standards available on the KLC website, rather than just Police Policies.[14] The law neither requires that officers adhere to "best practices" nor establishes that they must conform their actions to unadopted standards. Haney also argues that because Prater was at times walking away from the officers that force should not have been used to arrest him. This does not create any issue of fact.

It was Prater's own actions in failing to follow directions, fleeing, and resisting arrest which necessitated the use of force exercised in arresting him. Had Prater yielded to the law enforcement officers, force would not have been necessary, but Prater did not yield at any time and engaged in actions the officers perceived as threatening. It is immaterial then whether he was walking away from them at certain points. The key to the reasonableness of the officers' actions was that they had an absolute right to take Prater into custody for violating the law and continuing to violate the law, and when they tried to arrest him, Prater actively resisted them and continued to actively resist them while they used escalating non-life-threatening force in an attempt to subdue him until they finally were able to handcuff him.

---

[14] Buskin specifically relied upon the KLC Response to Resistance Policy 2020 which references Related Policies: Duty to Intervene, Ethics, Excited Delirium, and Dealing with Persons of Diminished Capacity.

Haney also relies upon her medical expert, Dr. Michael Freeman, to establish a question of fact about Prater's cause of death which would preclude summary judgment. Dr. Freeman opined in his affidavit as follows:

> Based on my preliminary review of the records in this matter, it is my opinion that the cause of Donald Prater's [death] is primarily attributable to the type, severity, and duration of restraint used on Mr. Prater by the Defendants, which most probably resulted in fatal injuries related to restraint-related asphyxia.

Dr. Freeman also opined that attributing Prater's death to "'excited delirium syndrome' is scientifically invalid" and such diagnosis "has been disavowed by a number of national medical organizations, including the American Medical Association, and when it is used in the context of a death investigation is almost exclusively used in situations involving prone restraint by law enforcement." Dr. Freeman admitted that his opinion was solely based on his review of the complaint, the amended complaint, and the answers of the defendants.

The defendants have challenged whether Dr. Freeman is qualified to provide any opinions, based on the fact that he is only licensed in the United States as a chiropractor and that he does not have a sufficient basis for his opinions. We need not resolve whether he would qualify as a medical expert as we reject any consideration of Dr. Freeman's opinion as it was solely based on his review of the pleadings, none of which are evidence as no binding admissions were made in the answers. As this was Haney's expert, it was wholly within her power to provide him with the available evidence at any time.

Importantly, the State Medical Examiner's reports confirmed that Prater did not sustain any serious injuries based upon the force used upon him and provided a cause of death that was not attributable to the officers' actions. It matters little whether excited delirium is an appropriate cause of death or not. Even if Prater's cause of death was listed as "undetermined," what matters is that Haney failed to produce any proof that Prater was killed because of excessive force, such as a blow to the head, damage to his airway, or positional asphyxiation. Instead, Haney relies upon the fact that Prater died after his arrest as proof that the officers must have killed him by using excessive force against him; this is not sufficient.

In conforming their actions to constitutional, statutory, and policy limits, the law enforcement officers established that they acted in good faith and qualified official immunity applies. The fact that in hindsight knowing that the officers' use of force may have contributed to Prater's fatal cardiac event might have led to different decision-making, does not make what was otherwise a reasonable level of force improper.

Because the officers were entitled to use force to arrest Haney, and the level of force used was appropriate, they were entitled to qualified official immunity. Haney has failed to provide any evidence to raise a question of fact regarding whether they committed battery, caused Prater's wrongful death, used excessive force in arresting him, or were even negligent (let alone grossly negligent).

### 3. Chief Ratliff is Entitled to Qualified Official Immunity and was Appropriately Dismissed.

Haney argues that because Chief Ratliff was not a law enforcement officer, he was acting outside the scope of his duties to hold Prater's arm so that he could be arrested and, thus, is not entitled to qualified immunity.

We agree with the circuit court and the Court of Appeals that Chief Ratliff was clearly acting within the scope of his discretion as a fire chief and head of EMS in first determining how best to assist the officers in securing Prater, in supervising Prater while he was in custody, and then in rendering first aid to Prater after observing his breathing difficulties. *See Caneyville Volunteer Fire Dept.,* 286 S.W.3d at 807-10 (explaining how qualified official immunity applies to a fire chief sued in his personal capacity for his official actions which include, pursuant to KRS 75.070(1), the provision of emergency services).

Haney has not made allegations which would create a factual question as to whether Chief Ratliff was acting in "bad faith." There is no allegation that he observed any use of force prior to the officers attempting to handcuff Prater and his only participation was to hold Prater's arm so this could be accomplished. There is also no allegation that he failed to render appropriate aid based on his observations and training. Accordingly, the determination that Chief Ratcliff was entitled to qualified official immunity properly resulted in his dismissal from the case.

Additionally, Haney has failed to explain how Chief Ratliff's simple holding of Prater's arm so that he could be lawfully arrested constituted

39

excessive force, battery, or any kind of negligence. Even if he were acting as a private citizen in assisting the officers, he simply cannot be liable as a matter of law.

Finally, the only possible remaining basis upon which Chief Ratliff could be liable is if he improperly administered medical aid to Prater, but Haney has failed to make any allegations that Prater did not receive appropriate medical treatment from Chief Ratliff and the officers.

**C. Reversal for Consideration of Whether there was a Special Relationship between Prater and the Law Enforcement Officers was Not Warranted.**

We disagree that there was any need for the Court of Appeals to reverse the grant of summary judgment to the law enforcement officers for the circuit court to consider whether Prater was due additional consideration because he had a "special relationship" with the officers by virtue of being in their custody. Not only did Haney never raise this issue below, but the existence of a special relationship with the officers cannot establish liability given the uncontested evidence.

Normally, government agents do not owe any duty to general members of the public. Therefore, negligence claims brought against them will not be actionable. *Fryman v. Harrison*, 896 S.W.2d 908, 910 (Ky. 1995).

To have an actionable negligence claim against governmental entities, the plaintiff must establish that a special relationship was present between the victim and those entities. *City of Florence, Ky. v. Chipman*, 38 S.W.3d 387, 392 (Ky. 2001). In other words, the plaintiff must establish that there is "special

40

duty owed to a specific identifiable person and not merely the breach of a general duty owed to the public at large." *Fryman*, 896 S.W.2d at 910.

> In order for the special relationship to exist, two conditions are required: 1) the victim must have been in state custody or otherwise restrained by the state at the time the injury producing act occurred, and 2) the violence or other offensive conduct must have been committed by a state actor.

*Chipman*, 38 S.W.3d at 392. There are narrow exceptions to these requirements: there is a special relationship between a Kentucky school district and its students who are compelled to attend school, *Ritchie v. Turner*, 559 S.W.3d 822, 830 (Ky. 2018), and between the law enforcement officers and recruited confidential informants, *Gaither v. Justice & Pub. Safety Cabinet*, 447 S.W.3d 628, 639 (Ky. 2014).

"[T]here is no duty to control the conduct of another or to warn those endangered by such conduct in the absence of a special relationship." *Chipman*, 38 S.W.3d at 391. Only once Prater was restrained by the officers, did the governmental entities have a special relationship with him, owing him the duty to "exercise ordinary care for his safety." *Gaither*, 447 S.W.3d at 639; *Commonwealth v. Russell*, 578 S.W.3d 747, 752 (Ky. App. 2019). However, the officers were privileged to use appropriate force to make Prater submit to being arrested. There is no evidence that any negligence occurred during the time the officers restrained Prater. Instead, they properly acted within the bounds of their privileged use of force.

Chief Ratliff observed Prater's condition after he was in handcuffs and when he noticed Prater was in respiratory distress, both he and the officers

41

immediately attempted lifesaving measures and summoned EMS. There is no evidence that officers were negligent where they acted within their discretion in allowing Chief Ratliff to supervise Prater's condition for them, worked together to perform CPR once Chief Ratliff indicated there was a problem, or permitted Chief Ratliff to administer Narcan to Prater. Therefore, while the officers owed Prater a duty while he was in their custody, Haney cannot establish any basis for a violation of such duty, so no liability can arise.

Furthermore, the Court of Appeals was incorrect in its analysis that the special relationship would provide an exemption from qualified official immunity. Instead, the special relationship only entitles the plaintiff to pursue an action for negligence. Qualified official immunity can still apply if the claimed act is discretionary (rather than ministerial) and otherwise satisfies the necessary requirements. *Ritchie,* 559 S.W.3d at 830–31; *Doe v. Logan,* 602 S.W.3d 177, 185 (Ky. App. 2020).[15]

The Court of Appeals erred in reversing on the basis that the circuit court acted prematurely in granting summary judgment based on qualified official immunity where there was no finding of whether the officers owed Prater a duty of care based on a "special relationship" which existed between

---

[15] *See Madden ex rel. Madden v. Town of Greene,* 36 Misc. 3d 852, 861–62, 949 N.Y.S.2d 326, 334–35 (N.Y. Sup. Ct. 2012) (explaining that a special relationship establishes the existence of a duty and is distinct from the question of qualified immunity); *Hernandez ex rel. Hernandez v. Tex. Dept. of Protective & Regulatory Servs.,* 380 F.3d 872, 880, 885-86. (5th Cir. 2004) (determining a special relationship existed between a foster child and the state and proceeding to determine that qualified official immunity under Texas law applied to immunize the social workers' reasonable discretionary conduct).

the parties by virtue of them arresting him. No finding was needed on this non-issue, which was not argued to the trial court and did not preclude the determination that qualified official immunity applied.

Although Deputy Tabor did not seek discretionary review regarding the Court of Appeals' decision to reverse for consideration of whether he could be liable to Haney based on him having a special relationship with Prater, to produce a consistent outcome we conclude that summary judgment was appropriately granted in his favor.

## D. The Governmental Entities Cannot be Liable where their Employee First Responders are Themselves Not Liable Based on Qualified Official Immunity.

At the outset, we note that the Sheriff's Department, as a subdivision of the County, generally has the same sovereign immunity as the County,[16] the Fire Department has governmental immunity,[17] and the City and its subdivision the Police Department have some immunity pursuant to CALGA for core governmental functions. This immunity is relevant in foreclosing suit against them, but more importantly, they cannot be liable where their employees are not liable when their actions meet the standard for qualified official immunity as discussed *infra*.

---

[16] Counties are cloaked with sovereign immunity as political subdivisions of the Commonwealth. *Lexington-Fayette Urban Cty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004). Creations of the county also have sovereign immunity. *See Bryant v. Louisville Metro Hous. Auth.*, 568 S.W.3d 839, 846-47 (Ky. 2019); *Comair, Inc. v. Lexington-Fayette Urban Cty. Airport Corp.*, 295 S.W.3d 91, 102-03 (Ky. 2009). Accordingly, the Sheriff's Department as a direct political subdivision of the County has sovereign immunity unless such sovereign immunity is waived.

[17] *See* KRS 75.070(1); *Caneyville Volunteer Fire Dept.*, 286 S.W.3d at 807.

### 1. Vicarious Liability

To the extent that Haney sought vicarious liability against the governmental entities, dismissal was appropriate. Pursuant to the Fire Department's governmental immunity, it cannot be held vicariously liable for the actions of its employees because such would nullify its immunity. *Sloas*, 201 S.W.3d at 477 *Schwindel v. Meade Cty.*, 113 S.W.3d 159, 163 (Ky. 2003); *Phillips v. Lexington-Fayette Urban Cnty. Gov't*, 331 S.W.3d 629, 632 (Ky. App. 2010).

While the Sheriff's Department can be liable under the limited waiver of sovereign immunity for the actions of its deputies as provided by KRS 70.040, this waiver only applies to the extent that a deputy does not have qualified official immunity. *Sheehy v. Volentine*, 706 S.W.3d 229, 244 (Ky. 2024).

Primary liability by employees is required for vicarious liability on the part of employers. *City of Louisville v. Bergel*, 610 S.W.2d 292, 293 (Ky. 1980); *Carucci*, 657 S.W.3d at 929; *Haugh*, 242 S.W.3d at 687. As the United States Supreme Court held in *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986), where governmental entities are only sued because they are thought to be legally responsible for their officers' actions, if the officers inflicted no injury upon the victim, it is inconceivable that the government entities can be liable. Therefore, cities cannot be vicariously liable for the actions of their employees if their employees have qualified official immunity. *Bergel*, 610 S.W.2d at 293; *Haugh*, 242 S.W.3d at 687.

44

Accordingly, the question of whether the governmental entities are immune is beside the point and irrelevant where there is no basis for liability because the employee first responders themselves are immune as it was previously established that their discretionary actions were protected by qualified official immunity. *See Grogan v. Commonwealth*, 577 S.W.2d 4, 6 (Ky. 1979).

**2. Negligent Hiring, Training, Retention, and Supervision**

To maintain an action against the governmental entities based upon their negligent hiring, training, retention, or supervision of their employees, there must be a finding that those employees committed a tort (either intentionally or negligently); otherwise, there is no basis to support liability and damages. *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 727, 730 (Ky. 2009). If claims are properly dismissed against governmental employees based on qualified official immunity, it follows that the claims against their employers for negligent hiring, training, retention, or supervision are also properly dismissed. *Morgan v. Bird*, 289 S.W.3d 222, 227 (Ky. App. 2009). This makes logical sense as even if the governmental entities were negligent regarding the hiring, training, retention, or supervision of such employees, such failure alone did not result in any harm to the victim.

As we have already determined that there is no factual dispute that the first responders acted appropriately in their use of force under the circumstances and are wholly immune under the doctrine of qualified official

45

immunity, it follows that the City, Police Department, and Sheriff's Department cannot be liable for negligent hiring, training, retention, or supervision.

### 3. Failure to Investigate

Finally, although Haney complains about the failure of the Police Department and the Sheriff's Department to engage in additional investigation after Prater died,[18] her amended complaint did not raise such failure as an actionable claim against them. Additionally, immunity protects the County and the Sheriff's Department from any liability. To the extent that Haney is making a claim that the City or its Police Department should have adopted or enforced any rule regarding the required procedures for investigating the cause of any in-custody death, this is a matter within the City's discretion of how to use its limited resources, a matter for which it is immune pursuant to CALGA. *See Morales v. City of Georgetown*, 709 S.W.3d 146, 164-65 (Ky. 2024); *Ashby v. City of Louisville*, 841 S.W.2d 184, 188 (Ky. App. 1992).

## III. CONCLUSION

First responders have a very difficult job which requires them to continually respond to rapidly evolving situations in a reasonable manner. For this reason, qualified official immunity is necessary to protect them from liability when they are acting appropriately within the bounds of the law, given

---

[18] For this contention, Haney relies upon her policing expert, Buskin, who stated "it is my opinion [that] the Lack of an Internal Investigation was inconsistent with established law enforcement best practices." As previously discussed, "best practices" are not the relevant standard. Haney has failed to point to any constitutional or statutory duty to conduct a more thorough investigation when there was no indication that any wrongdoing occurred.

46

the information they have at the time. The law enforcement officers acted judiciously in their application of force when faced with a difficult situation. While it is always tragic when someone dies, the fact that such death occurred while Prater was in custody is not enough to establish liability on the part of the first responders or the governmental entities that employed them.

We conclude that the Johnson Circuit Court properly granted dismissal to all of the defendants regarding each and every claim made by Haney for death and injury to Prater as Haney failed to establish that there were questions of fact left to be resolved. We affirm those portions of the Court of Appeals' opinion which dismissed claims against the defendants, reverse those portions of its opinion which reversed and remanded to the Johnson Circuit Court, and remand for any remaining proceedings which may be necessary.

Lambert, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. Bisig, Conley, Keller, and Nickell, JJ., concur. Lambert, C.J., concurs in result only. Goodwine, J., not sitting.

47

COUNSEL FOR APPELLANTS/CROSS-APPELLEES, PAINTSVILLE POLICE DEPARTMENT, ZACH STAPLETON, SHANE CANTRELL, AND CITY OF PAINTSVILLE:

Melissa Thompson Richardson
Colin Buckner
Zachary T. Epperson
Richardson Law Group, PLLC


COUNSEL FOR APPELLEE/CROSS-APPELLANT, PAULA M. HANEY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DONALD PRATER, JR.:

Andre F. Regard
Charles W. Rowland
Regard Law Group, PLLC


COUNSEL FOR APPELLEES, JEFF TABOR AND JOHNSON COUNTY SHERIFF'S DEPARTMENT:

Jonathan C. Shaw
Harry Ryan Altman
Grant R. Chenoweth
Porter, Banks, Baldwin & Shaw, PLLC


COUNSEL FOR APPELLEES, PAINTSVILLE FIRE DEPARTMENT, AND RICK RATLIFF:

Colin Buckner
Zachary T. Epperson
Melissa Thompson Richardson
Richardson Law Group, PLLC